UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------- x
WTC FAMILIES FOR A PROPER BURIAL, INC.; KURT :  
and DIANE HORNING; ANTHONY and GLORIA : **OPINION GRANTING**
INGRASSIA; ARTHUR and ARLENE RUSSO; JAGDISH : **DEFENDANTS'**
and INDIRA BHUKHAN; CATHERINE and ALBERT : **MOTION TO DISMISS**
REGENHARD; MONICA GABRIELLE; ROSEMARY :
CAIN; KRISTEN BREITWEISER; MINDY KLEINBERG; : 05 Civ. 7243 (AKH)
LORIE VAN AUKEN; and CAMILLE and WILLIAM :
DOYLE, :
  :
              Plaintiffs, :
     -against- :
  :
THE CITY OF NEW YORK; MICHAEL R. BLOOMBERG, :
Mayor of the City of New York; JOHN J. DOHERTY, :
Commissioner of the New York City Department of Sanitation; :
and AMANDA M. BURDEN, Chair of the New York City :
Department of City Planning, :
  :
              Defendants. :
--------------------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       The terrorists of September 11, 2001 murdered 2,749 people in Towers One and

Two of the World Trade Center. Approximately 1,100 of the victims perished without leaving a

trace, utterly consumed into incorporeality by the intense, raging fires, or pulverized into dust by

the massive tons of collapsing concrete and steel. Full bodies were recovered for only 292

victims, and partial remains were found for another 1,357 victims—sometimes a fragment of

bone or a possession, sometimes more. City workers and contractors have inspected every bit of

debris and, using sophisticated equipment, sifted the particles of debris to the extent of one-

quarter inch of diameter, the space between the concentric circles of a small paper clip, with no

further success. All human remains that could be identified, were identified. Only dust remains.

       Plaintiffs brought this lawsuit to force the City to reclaim the finely-sifted residue

of the World Trade Center debris at the City's Fresh Kills landfill in Staten Island, move it to a

more suitable location, and create a cemetery for the 1,100 who perished without identifiable remains. If no identifiable remains can be detected, plaintiffs argue, the ground itself has become hallowed. Plaintiffs allege that the City's failures violate their Constitutional rights to bury their deceased sons and daughters and next of kin, and that this lawsuit can bring redress.

The City denies that plaintiffs have constitutional rights to vindicate, or standing to sue, or that the City violated any constitutional or statutory rights or obligations. There are no remains to bury, the City argues, and plaintiffs have rejected the City's offers to create a memorial. The City moves to dismiss the case.

As the presiding judge, I have made repeated efforts to bring the parties to an amicable solution, without success. The City has offered a memorial, but the plaintiffs insist on a cemetery. Further postponement of the issues raised by this lawsuit will not benefit anyone. My task is to examine the pleadings challenged by the City and affidavits submitted by both sides, and, if the City is correct that there are no constitutional rights to redress, to rule accordingly.

### Facts and Procedural History

The City of New York assumed control of the World Trade Center site immediately following the devastating events of September 11, 2001. The first task was to search the site for people who could be saved, but there were few. The enormous tons of tangled debris left by the collapsed buildings had to be cleared even while searching for possible survivors and the remains of those who had perished. A closed landfill at Fresh Kills, Staten Island, that long had been the City's garbage dump, was chosen as the most practicable, and perhaps only, site to receive the cleared debris. Almost immediately, beginning September 12, 2001, debris was moved there, by truck and by barge. All visible human remains were carefully

removed at every stage, wherever and whenever found, bagged and brought to City-established collecting and preserving points. At Fresh Kills, the debris was off-loaded on a hill in the landfill, subjected to close examination, and pushed down the hill to make room for the next load.

*Evolution of the Debris Searching Process*

The amended complaint alleges that for approximately the first month of the cleanup operation, the materials were sifted using rakes and shovels. Once the debris had been examined, it was bulldozed over the side of the hill to make room for new loads of debris. The amended complaint alleges that this initial mode of review did not sufficiently allow the Defendants to locate human remains that were commingled with the debris.

Beginning on or about October 14, 2001, Defendants retained Taylor Recycling Facility LLC ("Taylor") and Yannuzzi Disposal Services, Inc. ("Yannuzzi") to use machinery to sift through the debris. The mechanized sorting process sifted debris to one-quarter inch in diameter, and was far more effective in locating human remains than the process previously used. The amended complaint also alleges that the debris that was examined using rakes and shovels during the first month of the cleanup effort was never reexamined using the Taylor and Yannuzzi machinery. The amended complaint alleges that of the 1.651 million tons of debris that was moved to Fresh Kills, only 1.05 million tons were searched using the mechanized process. According to the amended complaint, of the 601,000 tons that were not mechanically searched, approximately 187,000 tons were comprised of steel, leaving 414,000 tons "unsifted". Defendants' affidavits take issue with these assertions, and attest that the "unsifted" debris was re-sifted after the mechanized process was implemented.

*Treatment of Fines from the World Trade Center Site*

The amended complaint alleges that material that remained after sifting, the "fines", contained undetectable particles of human remains. Plaintiffs allege that they were repeatedly assured by Federal and State officials that the fines would be kept separate from the remainder of the debris and would eventually be transferred to a more appropriate location. Instead, plaintiffs allege, the fines were mixed with the garbage in the Fresh Kills dump.

In July 2002, family members of 9/11 victims visited the Fresh Kills landfill, and were allegedly told by a recovery worker that millings, or dividers, had been put down to separate the fines from the rest of the debris. The family members sent a letter to the Office of the Mayor and the Department of Sanitation, inquiring whether there were plans to move the fines to a more appropriate location. Plaintiffs allege that in July 2002, Christy Ferer, Mayor Bloomberg's liaison to the family members, responded via letter stating that options for suitable locations for the fines were being considered, and that the fines were being "set aside and maintained with reverence".

The amended complaint alleges that, in contrast to what plaintiffs were told, the fines were not kept separate, and the City did not formulate a plan to remove the fines from Fresh Kills to a more suitable location. The amended complaint acknowledges that the City claims that costs would be prohibitive, but alleges that the City's calculations are inflated.

*Formation and Activities of WTC Families*

In November 2003, WTC Families For a Proper Burial, Inc. was incorporated as a not for profit corporation under the laws of New York, with the stated purposes of representing the bereaved families, retrieving the remains of 9/11 victims located at Fresh Kills, and providing a proper burial and resting place for the remains. WTC Families purports to act on behalf of

approximately 1,100 families who lost relatives in the September 11 attacks but whose remains were not found and, therefore, may be mixed with the debris brought to Fresh Kills. The WTC Families claims that these 1,100 families signed a petition in support of WTC Families, as did 62,500 others. The President of WTC Families, Diane Horning, lost her son, Matthew D. Horning, in the 9/11 attacks. Matthew's wallet and a piece of his occipital bone were recovered from the debris at Fresh Kills and returned to Ms. Horning by the City.

In March 2004, plaintiffs attended a meeting of the City Planning Commission. At this meeting, a proposal to turn Fresh Kills into a public park was discussed. The plaintiffs asserted at that meeting that they would not accept any decision to leave the fines at the Fresh Kills site. In July 2004, plaintiffs received a letter from the Office of the Mayor informing them that the City had decided that the fines would not be removed from the Fresh Kills site. The letter invited plaintiffs to become involved in the design of a monument in honor of the World Trade Center victims to be displayed in the park. The plaintiffs wrote to request a meeting to discuss the issue, but the letter was not acknowledged.

In August 2004, plaintiffs visited the Fresh Kills site, and observed that Sections 1 and 9, the areas where the fines were located, were littered with other debris. On August 10, 2004, the plaintiffs appeared before the Commission arguing that the City was required to move the remains before the development of a park began. They allege that the Commission told them that Sections 1 and 9 would not be disturbed. However, in September 2004, plaintiffs learned that Sections 1 and 9 were being covered with dirt, and would no longer be kept separate from other materials. In October 2004, the plaintiffs again attended a Commission meeting, where they complained that Sections 1 and 9 were not being maintained properly. Plaintiffs allege also that they have been denied meaningful access to the site, because visits are conditioned on

permission of the Department of Sanitation and waivers of health hazards arising from such visits, and because journalists and professional photographers are denied access to the site.

*Procedural History*

In October 2004, plaintiffs filed a Notice of Claim against the City. In August 2005, plaintiffs filed their complaint in this Court, alleging violations of their Constitutional rights and of New York State law. In June 2006, plaintiffs filed an amended complaint. In October 2006, Defendants filed a motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for partial summary judgment on the second (due process), fifth (violation of New York State conservation and burial laws) and sixth (violation of New York State law) claims because, the defendants argue, the factual allegations underlying the claims are untrue. Plaintiffs opposed both motions. When extensive efforts to settle the dispute, before and after the motions were filed, were not successful, I scheduled oral argument on February 22, 2008.

I hold, with reluctance, for the suffering of the families thus affected by the events of September 11, 2001 is great, that plaintiffs are not able to state a legally sufficient claim for relief under the United States Constitution or under New York law. Consequently, defendants' motion is granted, and the Complaint is dismissed.

## Jurisdiction

The amended complaint alleges that this Court has federal question jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 42 U.S.C. § 1983, and under the Air Transportation Safety and System Stabilization Act ("ATSSSA"), 49 U.S.C. § 40101, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims. I hold that subject matter jurisdiction exists.

The Federal Constitutional claims clearly are before me.  28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.").  Furthermore, the ATSSSA provides for exclusive jurisdiction in the Southern District of New York over claims "resulting from or relating to the terrorist-related aircraft crashes" of September 11, 2001, ATSSSA, section 408(b)(3), and these are such claims.  Plaintiffs are bereaved because of the terrorist-related aircraft crashes of September 11, 2001, and their claims that their rights to arrange for a proper burial of their loved ones under New York State law are within this Court's exclusive jurisdiction.  And due to the similarity between the federal and state law claims and the facts giving rise to both, the state law claims are properly before me also pursuant to 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

**Discussion**

1. Standing

Defendants challenge the associational standing of WTC Families.  In order to establish associational standing, members of the association or group must have standing in their own right.  Bldg. & Constr. Trades Council v. Downtown Dev., Inc., 448 F.3d 138, 144 (2d Cir. 2006).  The association must also show that the interests that the association seeks to protect are germane to the organization's purpose and that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

In order to establish individual standing, a plaintiff must show that: (1) she has suffered an injury in fact, meaning that the injury is both (a) concrete and particularized and (b) actual and imminent, as opposed to hypothetical and conjectural; (2) the injury is fairly traceable to the actions of the defendants; and (3) it is likely, rather than speculative, that the injury will be redressed by a favorable outcome.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

Defendants argue first that the amended complaint fails to allege sufficient facts about the WTC Families members to show that WTC Families has standing to sue.  The amended complaint alleges that the WTC Families "is acting on behalf of approximately 1,100 families whose relatives died at the World Trade Center", but otherwise provides no information regarding the membership.  Thus, it is not known to what extent those 1,100 families actually support the aims of the lawsuit: disinterring whatever undetectable remains that are mixed with the tons of dirt at Fresh Kills, moving the dirt to some other location, and creating a cemetery, as opposed to leaving things undisturbed and creating a suitable memorial to those who died.  For every supporter of the lawsuit, there may be a small or large contingent—perhaps a majority— that would prefer to leave things in place and end recurring causes of grief.  In addition, the amended complaint alleges that family members on behalf of only 1,100 of the 2,457 victims for whom partial or total remains are missing have come forward in support of the WTC Families' objectives.  This means that the majority of victims' family members are not supporters or members of WTC Families.

Defendants argue that since relief affects everyone who was a victim and their next of kin, next of kin of all victims, rather than just of a subset, must be the plaintiffs; fewer than all interested parties cannot have standing to sue, except as a class certified to represent all

similarly situated.[1]  In <u>Comite En Memoria Del Vuelo 587 Inc. v. Hirsch</u>, 100382/2005 (2005) (unpublished opinion), family members of individuals who died when American Airlines Flight 587 crashed into Belle Harbor, Queens formed a Plaintiff Committee and sued the City for unidentifiable remains of the victims.  The New York Supreme Court dismissed the plaintiffs' complaint, holding that the Committee lacked standing because they had not alleged sufficient facts to show that any individual plaintiff had standing, and also expressed concern that there was no evidence that the relief sought by the Plaintiff Committee was embraced by the majority of victims' families, and "no safeguards ha[d] been shown to have been established to protect the interests of the other victims' families".  <u>Hirsch</u>, at 3.

Defendants also challenge WTC Families' standing on the ground that no family member can definitively show actual injury.  Because the fines at the World Trade Center site are materials of ¼ of an inch or smaller, and are unidentifiable and undifferentiated, it is pure speculation to argue that the remains of a relative of any individual WTC Families' member may be found among the fines.  Although, under New York law, there is a quasi-property right in the remains of a loved one, <u>see Caseres v. Ferrer</u>, 774 N.Y.S.2d 372, 433 (N.Y. App. Div. 2004), here there are no identifiable remains to which a property right could attach, only an undifferentiated mass of dirt.  Furthermore, no individual family member can establish that his or her family members' remains are among the fines at Fresh Kills, for they may have been entirely consumed by the intense fires.  Defendants argue that where there is nothing tangible, there are no remains, no actual injury, and no standing.

Plaintiffs argue that since some remains were found at the World Trade Center site—for example, Diane Horning's son's wallet and occipital bone—"[t]he logical conclusion to

_____

[1] Indeed, given the potential of disparate interests, serious questions exist as to whether common questions outweigh individual questions and whether members of the WTC Families and individual plaintiffs can satisfy the typicality requirement, casting doubt on whether a class could be certified in this case.

draw . . . is that at least some of Matthew's other bone fragments and remains would have been located in nearby debris, as would many remains from the 2,457 victims whose bodies have gone partially or completely missing".

I doubt that plaintiffs have adequately alleged, or could adequately allege, standing for all the reasons advanced by Defendants.  In an ordinary case, that would end the matter.  Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008).  "Standing is one of the essential prerequisites to jurisdiction under Article III."  Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912, 915 (D.C. Cir. 2003).  Standing is a threshold inquiry, and an indispensable part of a plaintiff's case; failure to establish standing generally obviates the need to consider the merits of a dispute.  See Medalie v. Bayer Corp., 510 F.3d 828, 829 (8th Cir. 2007).

But this is no ordinary case.  The aftermath of the events of September 11 is still being played out, in this Court and in countless personal lives.  The WTC Families was created for a specific purpose—to challenge the decisions made by the City and its officials regarding the manner in which the debris cleared from the World Trade Center and brought to Fresh Kills was handled.  WTC Families, and the individual plaintiffs whose lives were turned on end on September 11, deserve consideration, on the merits.  Society owes them no less.  Moreover, any concerns that plaintiffs do not speak for others similarly situated, or might even be opposed by some, is lessened by the fact that no interested person has come forward in opposition to the WTC Families' objectives, notwithstanding the large amount of publicity that this case has received.  See, e.g., Alan Feuer, Judge Hints He May Reject 9/11 Families' Plea To Sift Fresh Kills Remains, N.Y. Times, Feb. 23, 2008.  Consequently, I proceed to the merits.[2]

---

[2] Defendants also challenge the WTC Families' amended complaint for failing to join all necessary and dispensable parties, R. 19, Fed. R. Civ. P.  Defendants' arguments on this issue are similar to those raised in their standing challenge, i.e., that all next of kin of 9/11 victims have not been joined as parties, and because the relief WTC Families seek cannot be granted without affecting the rights of the non-party family members, the non-party family

2.  <u>Due Process Claim</u>

Counts 1 and 2 of the amended complaint allege that plaintiffs' constitutional rights to due process have been violated.  Plaintiffs seek redress pursuant to 42 U.S.C. § 1983.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law".  To establish a violation, a plaintiff must first identify the constitutional right at stake, and then allege that the deprivation was "arbitrary in the constitutional sense".  <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 537 (2d. Cir. 1994).

Plaintiffs allege in their amended complaint that defendants' actions in commingling the remains of their loved ones with the other debris from the World Trade Center site, and permanently leaving those commingled remains at Fresh Kills, violated their rights to the remains of their loved ones, including the right to provide their loved ones with a proper burial.  Plaintiffs allege also that the Defendants failed to re-search through the debris moved to Fresh Kills before the mechanized process was instituted (an allegation which Defendants factually contest), and that this alleged failure violated their due process rights.

State law defines the contours of constitutionally protected property interests. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972).  New York law recognizes a quasi-property right of the next of kin in the remains of a deceased for the purposes of ensuring a proper disposal of the remains.  <u>Colavito v. New York Organ Donor Network, Inc.</u>, 356 F. Supp. 2d 237, 243 (E.D.N.Y. 2005).  The right is not a property right in the ordinary sense of the term; rather the right extends only as far as necessary to entitle the next of kin to protection from violation or invasion of the place of burial, and to protect the next of kin's right to ensure a

---

members are indispensable and the litigation cannot go forward without them.  For the same reasons that I reject the defendants' standing arguments, I reject also their arguments raised under Rule 19.

proper burial.  Kellogg v. Office of the Chief Med. Exam'r of the City of New York, 791

N.Y.S.2d 278, 281 (N.Y. Sup. 2004); A.F. Hutchinson Land Co. v. Whitehead Bros. Co., 217

N.Y.S. 413, 418 (N.Y. Sup. 1926).

   This "quasi-property right" has been extended to identifiable, recoverable bodies

of next of kin.  See, e.g., Kellogg, 791 N.Y.S.2d at 278 (claim for unauthorized autopsy); Correa

v. Maimonides Med. Ctr., 629 N.Y.S.2d 673 (N.Y. Sup. 1995) (claim for lost body of stillborn

infant).  No case has extended such a right to an undifferentiated mass of dirt that may or may

not contain undetectable traces of human remains not identifiable to any particular human being.

The plaintiffs have not found any such case, and neither have I.  Without something tangible or

identifiable, there is no property right.  See Hirsch, at 3.

   Plaintiffs also must satisfy a second prong of argument, that the deprivation of

their rights rose to the level of egregious or arbitrary conduct that shocks the conscience, if the

actions of the Defendants were carried out under exigent circumstances.  County of Sacramento

v. Lewis, 523 U.S. 833, 846-47 (1998).  If the Defendants' actions were carried out under other

than exigent circumstances, and if more reasoned reflection was available to the Defendants,

then reckless or deliberate indifference may suffice to establish a due process violation.  Pabon v.

Wright, 459 F.3d 241, 251 (2d Cir. 2006).  Under either standard, mere lack of due care does not

rise to the level of a substantive due process violation.  Davidson v. Cannon, 474 U.S. 344, 348

(1986); Daniels v. Williams, 474 U.S. 327, 332 (1986); Pabon, 459 F.3d at 250.

   Defendants argue that they acted reasonably and properly in subjecting the World

Trade Center debris to state-of-the-art filtering.  If fault can be charged, the City maintains, the

fault cannot be worse than negligence.  See Daniels v. Williams, 474 U.S. 327, 331 (1986)

(holding that mere lack of due care does not give rise to a constitutional due process violation).

Plaintiffs argue that these contrasting contentions require an individualized inquiry and that it is inappropriate to dispose of the claim on a motion to dismiss. <u>County of Sacramento</u>, 523 U.S. at 850.

The parties dispute a number of facts and events. Plaintiffs contend that the debris initially moved to Fresh Kills was not re-sifted by the state-of-the-art sifting machinery that was later introduced; the City maintains that re-sifting did occur. The affidavits on the issue are not sufficiently clear, and I am unable to resolve the issue on motion. Plaintiffs contend that the City made promises that it did not keep, as to keeping the fines separate from garbage and debris. The parties dispute the cost of moving the fines to another area. And there may be additional facts that are disputed.

However, these disputes are not material to the constitutional issues that are at the heart of this lawsuit. It is clear, and the parties do not dispute, that the attacks of September 11, and the consequences, were unprecedented. There was no protocol on how to respond to the catastrophe suffered by the City. The collapse of the twin towers left a gaping hole in the City's skyline; the City's financial markets were paralyzed; an impenetrable smog infected lower Manhattan; fires had to be extinguished; and 1.6 million tons of debris had to be moved. In an amazing burst of patriotism, workers appeared on the site hours after the attacks, and the City marshaled contractors and workers to perform vital and immediate tasks of rescue, salvage and rehabilitation: (1) to search for survivors; (2) to search for remains or personal effects of victims; (3) to preserve evidence of the terrorists' criminal conduct; and (4) to clear debris and toxins from downtown Manhattan so that residents and businesses could again begin to function. It was important that the City move quickly, carefully and efficiently to satisfy these goals.

Clearly, the City acted responsibly, without "reckless or deliberate indifference that would shock the conscience".[3]  Plaintiffs have cited no evidence and made no allegation that Defendants acted with any such malevolent or reckless intent.  Even if I were to assume that plaintiffs' allegations concerning the sifting of debris are true, it is clear that the City sought through all of its actions to bring about a swift and efficient recovery from the terrorists' attack.  Plaintiffs' amended complaint evidences a dissatisfaction with the way in which the recovery effort was executed, but this dissatisfaction is not sufficient to establish a violation of plaintiffs' constitutional rights.  See Lombardi v. Whitman, 485 F.3d 73, 84 (2d Cir. 2007) ("[S]ubstantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect").  At most, plaintiffs' allegations with regard to the Defendants' handling of the fines amounts to a lack of due care, and a lack of due care is not enough to establish a due process violation.  See Daniels, 474 U.S. at 331.  Consequently, Counts 1 and 2 of the amended complaint are dismissed.

   3. <u>First Amendment Free Exercise Claim</u>

Plaintiffs allege, in Count 4 of the amended complaint, that they were denied their right to free exercise of their religious beliefs, guaranteed by the First and Fourteenth Amendments of the United States Constitution.  Plaintiffs allege that the mixing of fines with other debris, and the refusal of the City to segregate and move the fines to a proper reverent place deprived plaintiffs of their right to bury their loved ones in accordance with their religious dictates, in contravention of the Free Exercise Clause of the First Amendment.  Defendants move to dismiss the claim for failing to state a legally sufficient claim for relief.

---

[3] This is a finding as to this case alone.  The cases of the workers alleging respiratory injury and concerns arising from negligence and other fault by the City and its contractors, collected under 21 MC 100, raise different issues.

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof". Plaintiffs argue that the City's policies and practices with respect to the fines qualify as State action that deprives them of their rights to the free exercise of their religious beliefs in burying their family members who perished at the World Trade Center.

There is no constitutional case that applies this proposition to an undifferentiated mass of debris. The debris of the World Trade Center, stained with the memories of those who perished at their desks and in the corridors and stairwells of the Twin Towers, could well have been considered hallowed. But once the City assumed the quintessential municipal task of clearing the site of debris, the policies and procedures that were adopted had to be sensitive to a myriad of considerations: efficiencies and economies of operations; the practicalities of finding a site for the tangled mountain of 1.6 million tons of debris; the continuing search for identifiable remains, even such that were as small as the space between the two concentric ovals of a paper clip; the safety of workers sifting debris that could well be actively contaminating; and others. Considerations had to be given also to the Fresh Kills site, whether to leave it as a dump, or create a park and natural habitat, with a meaningful memorial to those who perished and who may be remembered where it can be said that their spirits have come to rest.

There is no allegation, and there can be no allegation, that the City's purpose in implementing these municipal concerns was to infringe on anyone's religious sensibilities. A burden incidentally imposed by a general rule, policy or statute does not violate a person's First Amendment rights to religious expression. Employ. Div. Dept. of Human Res. of Ore. v. Smith, 494 U.S. 872, 881 (1990). If the policy has a rational basis, there is no constitutional violation. Leebaert v. Harrington, 332 F.3d 134, 143 (2d Cir. 2003). Similarly, if the rules, policies, or

statutes in question do not target, and are not motivated to prohibit, a particular religious

practice, a First Amendment claim cannot prevail.  <u>Bronx Household of Faith v. Cmty. Sch. Dist.</u>

<u>No. 10</u>, 127 F.3d 207, 216 (2d Cir. 1997); <u>United States v. Amer</u>, 110 F.3d 873, 878 (2d Cir.

1997).

For example, in <u>Bronx Household of Faith</u>, the Second Circuit affirmed the

district court's grant of summary judgment for the defendants rejecting a first amendment free

speech claim.  In the case, the Bronx Household of Faith, an evangelical Christian church, sought

to use a public school gymnasium for the purpose of conducting religious services every Sunday.

The request was denied by the school board due to New York Education Law Section 414, which

does not list religious worship among the permitted uses of a public schoolhouse, and New York

City Board of Education policy promulgated pursuant to Section 414, which states that use of

public school premises by outside religious organizations to conduct religious worship or

instruction is prohibited, although use of the facilities for discussion of religious material, or

material with a religious viewpoint, is permitted.  <u>Id</u>. at 210-11.  The Bronx Household of Faith

claimed that Section 414 and the Board of Education's policy impermissibly singled out

religious services and instruction for exclusion.  The Second Circuit rejected this argument,

holding that the law and policy were permissible because it did "not bar any particular religious

practice.  They do not interfere in any way with the free exercise of religion by singling out a

particular religion or imposing any disabilities on the basis of religion."  <u>Id</u>. at 216.

Likewise, in <u>United States v. Amer</u>, the Second Circuit rejected a Free Exercise

Clause challenge to the International Parental Kidnapping Crime Act (IPKCA), 18 U.S.C. §

1204, which prohibits a parent from removing a child from the United States, or keeping a child

outside the United States, with the intent to interfere with and obstruct the other parent's right to

physical custody. 110 F.3d at 873. Defendant, a Muslim, challenged the IPKCA on the ground that it interfered with his ability to return his children to their birth country to "provide them with a proper Muslim upbringing" in violation of his rights under the Free Exercise Clause of the First Amendment. Id. at 879. The Second Circuit rejected this argument because the IPKCA is a neutral law of general applicability, with only an incidental burden on religious practice. Id. Like Bronx Household and Amer, the City's procedures in moving through the debris did not target religious beliefs.

Plaintiffs argue that the "rational basis" test enunciated by the United States Supreme Court in Smith has been changed by the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb et seq. That statute prohibits the government from substantially burdening a person's free exercise of religion, even if the burden is the result of application of a rule of general applicability, unless the government can demonstrate that the burden is (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that compelling governmental interest.

Even if I were to apply the first prong of the RFRA, and even assuming that there is a constitutional First Amendment right to compel the City to move a mass of earth and create a cemetery for people whose remains cannot be identified in that mass of earth, plaintiffs cannot prevail. The governmental interest in clearing the debris of the World Trade Center efficiently and economically was "compelling," and the sensitivities evident in the sifting process were praiseworthy. And the second prong of the RFRA test – the "least restrictive means of furthering that compelling governmental interest" – is not applicable to a case where the plaintiffs seek to compel the government to do something affirmative, at taxpayer expense.[4] See Skoros v. City of

_____

[4] Indeed, the Supreme Court invalidated the heightened standard of the RFRA as an invalid exercise of Congress's § 5 enforcement power, and confirmed that neutral laws, regulations and policies of general applicability that have

<u>New York</u>, 437 F.3d 1, 39 (2d Cir. 2006) ("Just as government may not compel any person to adopt a prescribed religious belief or form of worship, no person may require the Government itself to behave in ways that the individual believes will further his or her spiritual development or that or his or her family.").

Furthermore, I disagree with plaintiffs' proposition that the "rational basis" test of <u>Smith</u> is not applicable. I understand the importance of proper and respectful burial in numerous religious faiths. I sympathize deeply with plaintiffs' grief in not being able to bury their loved ones in conformity with the dictates of their religions. Nonetheless, there is no question that the task of clearing the debris of the World Trade Center was a monumental and unprecedented task. A more stringent test than "rational basis" would not be appropriate.

The City's actions satisfy both a "rational basis" and a "compelling interest" test. Count 4 of the Amended Complaint is dismissed as well.[5]

<u>State Law Claims</u>

Counts 3, 5 and 6 of the Amended Complaint allege claims under New York State Law. Defendants move to dismiss these as well.

Plaintiffs allege in Count 3 that they have a right to possess and bury the bodies of their next of kin. Plaintiffs allege in Counts 5 and 6 that Defendants' failure to re-sift through the approximately 414,000 tons of debris moved to Fresh Kills during the first month of the clean up operation violates "the meaning and intent of the laws of the State of New York relating to Conservation and Burial laws" and constitute wrongful and negligent acts under New York

---

only an incidental effect on religion need not be held to a standard higher than rational basis scrutiny. <u>See The City of Boerne v. Flores</u>, 521 U.S. 507, 533-35 (1997).

[5] Plaintiffs also argue that the Defendants' actions must be reviewed under a stricter standard because Plaintiffs' raise a "hybrid claim", i.e., Plaintiffs allege that Defendants' actions violate more than one Constitutional right. This claim is without merit. Rational basis scrutiny is all that is required on Plaintiffs' First Amendment claim, regardless of what other Constitutional claims Plaintiffs allege.

State law. Plaintiffs' brief clarifies that Count 5 is brought under New York Public Health Law § 4200, which provides, "every body of a deceased person within this state, shall be decently buried or incinerated within a reasonable time after death".

As discussed earlier in this opinion, this case concerns a total and complete absence of identifiable remains of any identifiable person. And just as that crucial fact was fatal to plaintiffs' Constitutional claims, it is fatal as well to plaintiffs' state law claims. Plaintiffs' New York State claims under the conservation, burial and/or public health laws cannot succeed because without identified remains of an identifiable deceased, there is no person, or part of a person, and there can be no right, to bury. And as I held in the discussion of plaintiffs' due process claim, plaintiffs have no property right in an undifferentiated, unidentifiable mass of dirt that may or may not contain the remains of plaintiffs' loved ones. See Colavito v. New York Organ Donor Network, Inc., 356 F. Supp. 2d 237, 243 (E.D.N.Y. 2005); Kellogg v. Office of the Chief Med. Exam'r of the City of New York, 791 N.Y.S.2d 278, 281 (N.Y. Sup. 2004); A.F. Hutchinson Land Co. v. Whitehead Bros. Co., 217 N.Y.S. 413, 418 (N.Y. Sup. 1926).

Moreover, plaintiffs in their complaint seek to have the fines currently resting at Fresh Kills removed and buried in a different location, to be made available by the City and at the expense of the City. Thus, plaintiffs seek to prevail upon the City to undertake the expense of moving many tons of debris and dirt and burying it in some other location. Nothing in the laws of New York requires such efforts. The City is under no obligation to provide property to certain of its citizens for burial of their loved one's remains, however worthy the citizen and however honorable the deceased. For this reason, too, plaintiffs' state law claims fail.

Furthermore, it is clear that defendants were confronted with difficult and unprecedented choices. Immediate searches for trapped individuals, rescue operations, and

emergency medical care had to be organized  The tangled mountain of debris at the World Trade Center had to be removed, and a site had to be found where the debris could be deposited. Procedures for separating the different components of the debris, and for trucking and barging these components had to be devised.  Safeguarding workers in a very dangerous work-site, and against the ever-present contaminants had to be a priority.  And there had to be a continuous search for human remains, and measures to collect and preserve that which was found.

The City argues that it should not be second-guessed on the choices it made to perform these functions. New York State courts have held that the doctrine of justiciability prevents litigants from challenging "[b]road policy choices", involving setting priorities and allocating finite resources, because those decisions are matters for the executive and legislative branches, not the judicial branch.  Jiggets v. Grinker, 553 N.E.2d 570, 572 (N.Y. 1990); see also Klostermann v. Cuomo, 463 N.E.2d 588, 593 (N.Y. 1984) ("Generally, the manner by which the State addresses complex societal and governmental issues is a subject left to the discretion of the legislative and executive branches of our tripartite system.").  Specifically, the choices made by the City in how to sift the debris to reduce the chances of overlooking human remains, and where to off-load and move the debris thus sifted, were difficult and complicated decisions. There was no blueprint that the City could follow in dealing with these problems.  See Dick v. City of New York, 2002 WL 31844745, at *2 (N.Y. Sup. Oct. 30, 2002) ("A municipality may not be held liable for the discretionary governmental acts—i.e., conduct involving the exercise of reasoned judgment—of its public employees even when such conduct is negligent.").   The leeway that the City is afforded in dealing with the mountain of debris provides additional support to my holding to dismiss plaintiffs' state law claims.

## <u>Conclusion</u>

The events of September 11, 2001 will never be forgotten.  No one knows the truth of these words more than those individuals who lost their loved ones to the attacks.  In a very real sense, those individuals have suffered a wrong for which there can be no remedy.  No matter the authority or power of this Court, it cannot bring back the loved ones lost, and it cannot bring peace to the plaintiffs or surcease to society's collective grief around the events of September 11, 2001.

Not every wrong can be addressed through the judicial process.  The grave harm suffered by the plaintiffs in this case is undeniable.  But the jurisdiction of a court is limited.  Here, my duty under the law is to determine whether plaintiffs have stated a legally sufficient claim of violation of the United States Constitution and of New York State law. For the reasons discussed in this opinion, I hold that plaintiffs have not stated, and cannot state, legally sufficient claims, and I dismiss plaintiffs' amended complaint.

The City has a plan for a beautiful nature preserve and park at the Fresh Kills site.  There is room for a memorial on a height with a view of where the Twin Towers stood.  The energy applied to this lawsuit might well be transferred to participating in the planning of the park and memorial.  What better reverence could there be than a memorial that both recalls those who died, even without leaving a trace, and points to the tenacity and beauty of life that must go on?  The terrorists sought to destroy our lives and our freedom.  They failed, and a memorial in such a beautiful setting can symbolize the vital continuation of our vibrant democracy.

The Clerk shall mark the case closed, but the Court will remain open to assist the

parties in working towards a suitable solution.

SO ORDERED.

Dated:     July __7__, 2008
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge